No. 111,749

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBBY HEIRONIMUS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The offenses of leaving the scene of an injury accident under K.S.A. 2011 Supp. 8-1602 and failure to give information under K.S.A. 2011 Supp. 8-1604 are multiplicitous.

2.

General criminal intent is a necessary element of leaving the scene of an injury accident under K.S.A. 2011 Supp. 8-1602. Accordingly, the State must allege and the instructions must include the element that the defendant intentionally, knowingly, or recklessly left the scene of an injury accident.

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed August 21, 2015. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Andrew R. Davidson*, assistant district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

1

Before BRUNS, P.J., HILL and ARNOLD-BURGER, JJ.

ARNOLD-BURGER, J.: On a dark night, Jeff Nusser decided to jaywalk across Main Street. Before he reached the other side, Robby Heironimus struck him with the right brake pedal of his motorcycle. Heironimus left the scene but turned himself into the police the next day when he realized that he hit Nusser. The State charged him with five offenses stemming from this incident, and a jury convicted him of all charges. Heironimus raises several issues on appeal. Because the charges of leaving the scene of an injury accident and failure to give information following an accident are multiplicitous, we are required to reverse his conviction for failure to give information and vacate his sentence. Likewise, Heironimus' conviction for failure to report an injury accident must be reversed because the statute under which he was charged was repealed at the time of the offense. Finally, because general criminal intent is a necessary element of leaving the scene of an injury accident and the court committed reversible error by not including this element in its instructions to the jury, we must reverse Heironimus' conviction for leaving the scene of an injury accident and remand for a new trial. Heironimus does not challenge his remaining convictions for driving on a suspended license and illegally displaying his vehicle tag, so those convictions stand.

FACTUAL AND PROCEDURAL HISTORY

One night in May 2012, just after 9 p.m., Nusser decided to walk from his apartment to the Hastings store in Hutchinson. He was wearing a black shirt, black pants, black shoes, and had headphones in his ears. He also had long dark hair. At one point during his walk, he elected to cross Main Street at a place not marked by a crosswalk. He looked both ways, ensured that he saw no headlights in either direction, and began to cross the street. He crossed the southbound lanes of traffic successfully and paused in the middle of the street to double-check for any northbound headlights. The nearest

2

headlights he could see were at 17th Street, at least 2 blocks south of his position, so he proceeded to cross the northbound lanes of traffic.

As Nusser crossed the street, a motorcycle, driven by Heironimus, struck him. Nusser remembered "hearing the engine and seeing a flash of the headlight right before [he] felt the impact." The accident resulted in the amputation of his leg 6 to 8 inches down from the knee and a permanently dislocated bone in his left hand.

At roughly the same time, Holly Zizumbo and her son were in an automobile traveling in the area. She and several motorcycles all waited together at a red light at the intersection of 17th and Main. Her headlights were on, and street lights illuminated the area. She described the motorcycles in her lane as "Harley-type" cruiser-style bikes and the motorcycles in the other lane as "crotch rockets." Of the two men driving Harley-style bikes, one wore a bandanna. Zizumbo noticed that his motorcycle also had what she termed "ape hanger" handlebars. When the light changed, the motorcycles accelerated, "racing in front of" Zizumbo and pulling far away from her despite the fact that she accelerated to 40 miles per hour. She estimated their speed at 60 miles per hour. As she drove, she witnessed what she "thought was somebody on the motorcycle wrecking." She testified that a body "[flew] up in the air," over the head of one of the Harley-style motorcyclists, "and hit the ground." The motorcycles all left the scene, but Zizumbo parked and discovered Nusser lying on the ground. His leg injury was severe and "there was pieces of bone all over the ground."

The two drivers of the crotch-rocket style motorcycles, Rane Daines and Daulphus Koeppen, also witnessed the accident. Daines explained that the driver with the ape hanger handlebars kept "[r]evving his motor up like he was wanting to race." When the light changed to green, Daines witnessed the motorcycle driving "erratically" and fast enough that he and Koeppen "wasn't even going to try and catch him." Daines and Koeppen both said that the motorcycle in question suffered a "speed wobble" ahead of

3

them. Daines saw a man "flying in the air," while Koeppen saw "a kid on the side of the road." But both men said that the driver of the motorcycle with the ape hangers wore a bandanna. Both witnesses also claimed that they later saw that same man stop "in front of the Fairgrounds" to inspect his motorcycle.

Nearly 24 hours after the accident, Heironimus called the Hutchinson Police Department and informed the duty officer that he believed he hit something while riding his motorcycle the night before. When an officer arrived at his home, Heironimus said he remembered feeling something hit his right foot but explained that he only called in after reading an article and speaking to others about the accident. An examination of Heironimus' motorcycle revealed a dent on the bracket around the brake pedal, which Heironimus admitted "was bigger now than what it was before." Heironimus confirmed that he wore a bandanna on the night of the accident. He also told the officer that although he did not stop when something struck his foot, "the pain was severe enough to get his attention." Nusser's DNA was not recovered from Heironimus' motorcycle, although Heironimus admitted he had washed the motorcycle that day.

Based on this sequence of events, the State charged Heironimus with five offenses: leaving the scene of an injury accident, failure to report an injury accident, driving while suspended, failure to give information, and illegal display of tag. The case proceeded to jury trial.

At the close of evidence, the parties and the district court discussed the mental state required to commit leaving the scene of an injury accident, failure to report an injury accident, and failure to give information. Heironimus contended that because the statutes in question lacked a clear legislative intent to impose absolute liability, the complaint and jury instructions needed to include a mental state. The State, which had amended the complaint to remove the word "intentionally" a few days earlier, contended that the

4

statutes in question imposed absolute liability. The district court agreed with the State and denied Heironimus' request to include mental states in the jury instructions.

The jury convicted Heironimus of all five offenses. The district court sentenced him to 18 months of probation with a total underlying sentence of 24 months' imprisonment. Heironimus appealed.

ANALYSIS

*The offenses of leaving the scene of an injury accident and failure to give information are multiplicitous.*

Heironimus first contends that leaving the scene of an injury accident and failure to give information are multiplicitous. Specifically, he argues that because one element of leaving the scene concerns the driver's failure to stay and provide his required information, failure to give information is a lesser included offense. Whether two convictions are multiplicitous is a question of law over which this court exercises unlimited review. *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Multiplicity is defined as "the charging of a single offense in several counts of a complaint or information" and violates both the United States and Kansas Constitutions by imposing multiple punishments for a single offense. 281 Kan. 453, Syl. ¶ 11. Although our Kansas courts long used what is commonly referred to as the "same-elements test" to examine these issues, our Kansas Supreme Court recently determined that a statutory test for multiplicity has supplanted this traditional two-step analysis. *State v. Hensley*, 298 Kan. 422, 436, 313 P.3d 814 (2013). This statutory test provides that "the defendant may be convicted of either the crime charged or a lesser included crime, but not both" and provides four potential definitions of lesser included crime. K.S.A. 2011 Supp. 21-5109(b). Heironimus argues that failure to give information is a lesser included

5

crime under the second of these definitions, as it is "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2011 Supp. 21-5109(b)(2).

K.S.A. 2011 Supp. 8-1602(a) provides:

> "The driver of any vehicle involved in an accident resulting in injury to, great bodily harm to or death of any person or damage to any attended vehicle or property shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible, but shall then immediately return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of K.S.A. 8-1604, and amendments thereto."

The penalty imposed for leaving the scene of an accident depends on the damage the accident causes. K.S.A. 2011 Supp. 8-1602(b). Leaving the scene of an accident that caused great bodily harm is a level 8 person felony. K.S.A. 2011 Supp. 8-1602(b)(3).

As it happens, K.S.A. 2011 Supp. 8-1604 is the statute under which failure to give information is charged. The relevant section of that statute requires that the driver of a vehicle involved in an accident must provide specific information "to any police officer at the scene of the accident or who is investigating the accident" and "immediately make efforts to determine whether any person involved in such accident was injured or killed" and render aid to those hurt. K.S.A. 2011 Supp. 8-1604(a).

Heironimus' argument regarding the multiplicitous nature of these two offenses is based entirely on *City of Overland Park v. Estell*, 8 Kan. App. 2d 182, 653 P.2d 819 (1982), *rev. denied* 232 Kan. 875 (1983). There, the defendant was convicted of violating three sections of a municipal traffic ordinance. He argued that these sections, which this court described as being "in substantial conformity" with the then-current versions of leaving the scene of an injury accident, failure to give information, and failure to report

6

an injury accident, were multiplicitous because the latter two constituted lesser included crimes of the first. 8 Kan. App. 2d at 185.

After studying the ordinance sections involved, this court agreed with the defendant. 8 Kan. App. 2d at 185. The court reasoned that section 23 of the ordinance—the section similar to what is now K.S.A. 2011 Supp. 8-1602—required that a driver remain on the scene of an accident until that driver supplied all the information required by section 25—the section similar to K.S.A. 2011 Supp. 8-1604. 8 Kan. App. 2d at 185. Because the defendant's violation of section 23 stemmed from his failure to supply the information listed in section 25, the court determined that

> "the elements necessary to prove a violation of section 25 were identical to those required to prove a violation of section 23. As a violation of section 25 was necessarily proved by the proof of a violation of section 23, section 25 was a lesser included offense of that proscribed by section 23." 8 Kan. App. 2d at 185.

In other words, because the defendant's conviction for leaving the scene of an injury accident relied on his failure to give information, failure to give information constituted a lesser included crime and that conviction was reversed. 8 Kan. App. 2d at 185.

The State concedes that *Estell* controls. Here, Heironimus clearly failed to stop and remain at the scene of the accident until he fulfilled the requirements of K.S.A. 2011 Supp. 8-1604. See K.S.A. 2011 Supp. 8-1602(a). But because his failure to comply with those requirements is an essential element of the offense, his failure to give information is a lesser included crime of leaving the scene of an injury accident. As such, he cannot be convicted of both crimes. See K.S.A. 2011 Supp. 21-5109(b). Therefore, like in *Estell*, his conviction for failure to give information must be reversed and his sentence vacated. See 8 Kan. App. 2d at 188.

*General criminal intent is a necessary element of leaving the scene of an injury accident.*

Heironimus next argues that the district court committed an error of law by allowing the State to prosecute him without proving his intent. Heironimus contends that knowledge of an accident is an essential element of leaving the scene of an injury accident and that the State needed to prove that element. By allowing the State to amend this element out of the complaint and failing to instruct the jury regarding that mental state, Heironimus argues, the district court committed a reversible error of law.

Because this question concerns the interpretation of a statute, this court exercises unlimited review. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12, *cert. denied* 135 S. Ct. 91 (2014).

Heironimus' argument relies heavily on our Kansas Supreme Court's holding in *State v. Wall*, 206 Kan. 760, 482 P.3d 41 (1971). There, the court examined sections 518 and 520 of the traffic code—or what are now K.S.A. 2011 Supp. 8-1602 and 8-1604, respectively—and explained:

> "Section 518 specifically relates to section 520, the clear intent of the two being to require such a driver to stop and then furnish specific information and appropriate aid for the benefit of any occupant of the other vehicle who may have been injured in the collision. Section 520 prescribes an affirmative course of action to be taken by the driver. Implicit therein must be the element of recognition or awareness on the part of that driver of the fact of collision. We cannot believe the legislature intended a penalty to be imposed for failing to follow that course of action if a driver was in fact unaware of the occurrence of collision. We do not imply an accused must have positive knowledge of the nature or extent of injury resulting from the collision . . . . We think it sufficient if the circumstances are such as to induce in a reasonable person a belief that collision has occurred; otherwise a callous person might nullify the humanitarian purpose of the statute by the simple act of immediate flight from an accident scene without ascertaining exactly what had occurred." 206 Kan. at 764.

8

The year after the offense in *Wall* occurred, however, the legislature passed several statutes concerning criminal intent and culpable mental states. See K.S.A. 21-3201 (Weeks 1974); K.S.A. 21-3202 (Weeks 1974); K.S.A. 21-3204 (Weeks 1974). These statutes provided, among other things, that "[a] person may be guilty of an offense without having criminal intent if the crime is a misdemeanor and the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described." K.S.A. 21-3204 (Weeks 1974).

Although the legislature has amended and recodified these statutes over time, it remains that "[i]f the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." K.S.A. 2011 Supp. 21-5202(d). Additionally, the legislature is now free to define felony crimes as absolute liability offenses. See K.S.A. 2011 Supp. 21-5203 ("A person may be guilty of a crime without having a culpable mental state" when the crime is "a felony and the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described.").

Application of these concepts to our Kansas traffic offenses is complicated. For example, in *Estell*, the defendant argued that the district court erred by not instructing the jury regarding his mental state at the time he left the scene of the accident. This court determined that "the offense charged under section 23 of the ordinance, substantially that proscribed by K.S.A. 8-1602, is an absolute liability offense when considered in light of" what is now K.S.A. 2011 Supp. 21-5203. 8 Kan. App. 2d at 187. Although the court reasoned that a defendant could potentially defend against such a charge by showing he or she "had somehow been rendered unaware of the accident" or had been removed from the scene against his or her will, the court also found those scenarios inapplicable to the facts of the case before it. 8 Kan. App. 2d at 187. This court later applied *Estell*'s reasoning regarding absolute liability when determining whether compulsion is a defense

9

to leaving the scene of an accident. See *State v. Riedl*, 15 Kan. App. 2d 326, 327-29, 807 P.2d 697 (1991).

Citing *Estell*, *Riedl* also reiterated that a driver could defend against the charge by showing he or she was rendered unaware of the accident. 15 Kan. App. 2d at 329. This logic runs afoul of the general rule that "[t]he only proof required to convict an individual of an absolute liability offense is that the individual engaged in the prohibited conduct." *State v. Creamer*, 26 Kan. App. 2d 914, Syl. ¶ 1, 996 P.2d 339 (2000). After all, if engaging in the prohibited conduct—that is, leaving the place where an accident occurred—is all that is required to convict an individual of leaving the scene of an accident, the driver's knowledge of that accident should be irrelevant. Moreover, these cases are decades old and reflect earlier versions of what are now our culpable mental state statutes.

In a recent case concerning issues of search and seizure and hot pursuit, this court appeared to recognize the necessity for some level of mental culpability for this offense. Specifically, the court noted that "[w]hile leaving the scene of an accident reflects a degree of deliberateness uncharacteristic of most traffic violations, that does not distinguish it from the run of misdemeanors requiring at least general criminal intent." *State v. Dugan*, 47 Kan. App. 2d 582, 601, 276 P.3d 819 (2012). Of course, this reference is dicta, but it also highlights the inherent difficulty in *Estell*'s holding.

Moreover, our Kansas Supreme Court has applied the above principles concerning criminal intent and culpable mental state to another traffic-related offense. In *State v. Lewis*, 263 Kan. 843, 852-58, 953 P.2d 1016 (1998), our Supreme Court considered whether knowledge of one's status as a habitual traffic violator constituted an essential element of the offense. After first determining that the criminal intent statutes in effect at the time applied to offenses under the traffic code, the court moved on to consider whether the habitual violator offense fell under the exception to the intent requirement.

10

After examining the criminal intent statutes, which the court concluded were "in accord with the 'contemporary view' disfavoring strict liability offenses," the court concluded that the exceptions did not apply and that the habitual violator offense therefore required a culpable mental state. 263 Kan. at 857-58.

Relying entirely on *Estell*, the State urges this court to find that K.S.A. 2011 Supp. 8-1602 imposes absolute liability under K.S.A. 2011 Supp. 21-5203 and affirm Heironimus' conviction. However, the plain language of K.S.A. 2011 Supp. 21-5203 and the foregoing analysis preclude such a simple solution. Because the accident in the instant case caused great bodily harm, Heironimus was charged under K.S.A. 2011 Supp. 8-1602(b)(3) and therefore with a felony. K.S.A. 2011 Supp. 21-5203(b) provides that for felonies, liability without a criminal intent can only be imposed when the statute defining the felony offense "clearly indicates a legislative purpose to impose absolute liability." There is no such clearly indicated legislative purpose in the statute at issue here. See K.S.A. 2011 Supp. 8-1602(a). Additionally, nothing in the statute "plainly dispenses with any mental element." K.S.A. 2011 Supp. 21-5202(d).

For the first time in oral argument, the State asserted that because K.S.A. 2011 Supp. 8-1602(b)(5) specifically requires that the person know that the accident resulted in injury or death in order to be guilty of a level 5 person felony for leaving the scene, the absence of such a requirement in K.S.A. 2011 Supp. 8-1602(b)(3) makes it clear that no intent is required. We do not find this argument persuasive. K.S.A. 2011 Supp. 8-1602(b)(5) simply increases the penalty if the person knows that injury or death resulted from the accident. This specific knowledge requirement—that injury or death resulted— is necessary to enhance the penalty. It does not speak to the general criminal intent and knowledge that an accident occurred at all. To the contrary, other offenses lacking a mental element, such as possession of firearms on certain government property, clearly announce themselves as absolute liability offenses. See K.S.A. 2014 Supp. 21-6309(a) ("It shall be unlawful to possess, *with no requirement of a culpable mental state*, a

11

firearm . . . ." [Emphasis added.]). Other examples with similar language concerning the lack of mental state include smoking in enclosed areas or public meetings, illegal ownership or keeping of an animal, and one instance of unlawful conduct of cockfighting. K.S.A. 2014 Supp. 21-6110(a); K.S.A. 2014 Supp. 21-6415(a); K.S.A. 2014 Supp. 21-6417(a)(1).

Because a culpable mental state is required unless the definition of an offense plainly dispenses with that requirement or clearly indicates a legislative purpose to impose absolute liability and K.S.A. 2011 Supp. 8-1602 lacks both these indicators, it is clear that criminal intent must be an element of that offense. As provided by the criminal intent statutes, if a crime lacks a prescribed culpable mental state, "'intent,' 'knowledge' or 'recklessness' suffices to establish criminal responsibility." K.S.A. 2011 Supp. 21-5202(e). The State therefore needed to plead and prove that Heironimus intentionally, knowingly, or recklessly left the scene of an injury accident in violation of the requirements of K.S.A. 2011 Supp. 8-1602(a).

*Amendment of the complaint to omit the intent requirement did not prejudice Heironimus.*

Four days prior to trial, the State amended the complaint against Heironimus to omit its allegation that he *intentionally* failed to stop his vehicle.

Heironimus insists that this amendment to the complaint prejudiced his defense. Although he attacked the sufficiency of the instruction related to this charge before the district court—an issue that will be addressed next—he did not attack the sufficiency of the complaint below. This court must therefore review his challenge based on the standard first announced in *State v. Hall*, 246 Kan. 728, 793 P.2d 737 (1990), *overruled on other grounds by Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003). Under this standard, Heironimus must show that the complaint (1) prejudiced him as he prepared his defense; (2) "impair[ed] his ability to plead the conviction as a bar to a later prosecution";

or (3) limited his substantial rights. *State v. Tapia*, 42 Kan. App. 2d 615, 621, 214 P.3d 1211 (2009), *aff'd* 295 Kan. 978, 287 P.3d 879 (2012).

But a review of the record runs directly counter to this claim. Heironimus emphasized his lack of intent at trial. He cross-examined witnesses concerning Nusser's dark clothes and his continued statements that although he knew he hit something, he only realized he possibly hit a person the day after the accident. In short, nothing suggests that this last-minute change to the complaint prejudiced him.

*Failing to instruct the jury that Heironimus intentionally, knowingly, or recklessly left the scene of an injury accident did prejudice Heironimus and was reversible error.*

Turning to the jury instruction issue, Heironimus clearly objected to the proposed instructions before the district court. As such, this court must engage in a multistep process to determine whether the district court erred by failing to include the element of intent. Specifically, the court must "'use an unlimited review to determine whether the instruction was legally appropriate,'" consider whether sufficient evidence supported the instruction, and determine whether the instructional error, if any occurred, was harmless. *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013).

The foregoing analysis demonstrates that including the criminal intent element of the crime charged was not only legally appropriate but required under the circumstances. There is no dispute that sufficient evidence supported giving the instruction, as the State charged Heironimus with the offense in question and Heironimus clearly raised the issue of his knowledge of the accident at trial. Because the instruction was legally and factually appropriate, the question this court must focus on is whether omission of the element at issue is harmless. See *State v. Daniels*, 278 Kan. 53, 62, 91 P.3d 1147 (holding that the omission of an essential element of an offense from the jury instructions is subject to the harmless error test), *cert. denied* 543 U.S. 982 (2004).

13

In recent years, our Kansas courts have repeatedly considered the harmlessness of omitted elements. For example, in *Daniels*, the district court omitted the element of bodily harm from a robbery instruction. Adopting the United States Supreme Court's test on this issue, our Supreme Court held that "'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.'" 278 Kan. at 62. In other words, if the record contains no evidence contesting the omitted element, the omission is harmless. 278 Kan. at 62. Based on this test, the court determined that the error was harmless due to the overwhelming evidence of bodily harm. 278 Kan. at 62-63.

In *State v. Garza*, 290 Kan. 1021, 1031-32, 236 P.3d 501 (2010), our Supreme Court applied this test when determining that failure to include the element of the defendant's age was harmless because there was "no dispute" about his age at trial. But in another case, when the district court failed to instruct the jury on an essential element of fleeing or attempting to elude law enforcement—namely, the element defining the five moving violations the driver committed while fleeing—our Supreme Court reversed the conviction because it could not determine whether the jury correctly found five moving violations. *State v. Richardson*, 290 Kan. 176, 179, 183-84, 224 P.3d 553 (2010).

Here, the issue of Heironimus' intent is indeed in dispute. The officer who talked to Heironimus testified that Heironimus believed he might have struck something while riding his motorcycle but never acknowledged that he hit Nusser. In fact, according to the officer, Heironimus stated that he only learned of the accident when he read an article the next day. He also essentially turned himself in when he realized his involvement. The only evidence of any sort of impact was the slight additional damage to Heironimus' brake pedal, and there was no blood or gore on the motorcycle. The other witnesses, including those who drove behind Heironimus, admitted generally that Nusser wore dark clothes and that they only noticed him after the accident occurred. This testimony runs

14

counter to the claim that Heironimus intentionally left the scene of the accident. It therefore cannot fairly be said that the omitted element was supported by overwhelming evidence. Unlike in *Daniels* and *Garza*, it is possible that a jury properly instructed on all elements could have found that Heironimus lacked the required mental element and acquitted him. As such, the error in this case is not harmless.

In conclusion, our Kansas criminal intent statutes and caselaw make clear that a culpable mental state is an essential element of leaving the scene of an injury accident. Although the late amendment to the complaint removing that element failed to prejudice Heironimus, excluding that element from the jury instructions constituted reversible error. Heironimus' conviction on this count must be reversed and remanded for new trial.

*Heironimus' conviction for failure to report an injury accident must be reversed because the statute under which he was charged was repealed.*

Heironimus next argues that his conviction for failure to report an injury accident must be reversed because the legislature repealed the statute criminalizing this conduct in July 2011. Because the statute no longer existed at the time he struck Nusser, Heironimus contends that he could not have legally been convicted of this offense.

It is a well-settled statement of law that the "'criminal statutes in effect at the time of the offense control the charge as well as the sentence resulting therefrom.'" *State v. Edwards*, 28 Kan. App. 2d 379, 380, 15 P.3d 855 (2000). Here, failure to report an injury accident, once codified at K.S.A. 2010 Supp. 8-1606, no longer existed in May 2012. See K.S.A. 2011 Supp. 8-1606. As such, at the time Heironimus failed to report the accident at issue in this case, failing to report such an accident was not a criminal offense.

The State concedes this issue, admitting that it looked up the charging language on what it believed to be the Kansas Legislature's website. A review of the website in

15

question reveals that the State in fact relied on a now-defunct website not run by the Kansas government. Regardless, Heironimus' conviction on this count must be reversed and his sentence vacated.

In sum, we reverse Heironimus' convictions for failure to report an injury accident and failure to give information and vacate his sentences for those offenses. We reverse his conviction for leaving the scene of an injury accident and remand for a new trial. Because Heironimus does not challenge his convictions for driving on a suspended license and illegally displaying his vehicle tag, those convictions are affirmed.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.